

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NOS. 02-09-00426-CR
## 02-09-00427-CR
## 02-09-00428-CR

GARY NOLEN HUDDLESTON                                          APPELLANT

V.

THE STATE OF TEXAS                                                  STATE

----------

## FROM THE 415TH DISTRICT COURT OF PARKER COUNTY

----------

## MEMORANDUM OPINION[1]

----------

## I. INTRODUCTION

A jury found Appellant Gary Nolen Huddleston guilty of two counts of aggravated kidnapping and one count of conspiracy to commit aggravated robbery. Huddleston pleaded "true" to the enhancement allegations, and the jury assessed punishment at life imprisonment in the two aggravated kidnapping

---

[1]*See* Tex. R. App. P. 47.4.

causes and at ninety-nine years' imprisonment for the conspiracy cause. In four points, Huddleston challenges the sufficiency of the evidence. We will affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

On January 16, 2007, Casey McCarter received a call at work from his mother, who lives near Casey's residence. She asked Casey to come home because she saw someone that she did not recognize at Casey's house. When Casey arrived home, he was confronted by an armed man wearing all black, a mask, and sunglasses. The man told Casey, "We're just here for the money. Do what you're told and no one will get hurt." When Casey began to question the man, a second armed intruder stepped out of the kitchen behind him; the man told Casey to shut up and that they would ask the questions.[2] The men made Casey sit in a chair, and they blindfolded him.

The men interrogated Casey about employees of the Wells Fargo Bank where his wife worked. Casey became angry at one point, took off the blindfold, stood up, and grabbed the barrel of No. 1's gun. No. 2 pointed a black Beretta pistol at Casey's head and threatened to kill him. Following this exchange, the intruders blindfolded Casey again and bound his arms and legs to a chair with zip ties.

Casey's wife Dawn McCarter arrived home from work soon thereafter. The intruders confronted Dawn while brandishing firearms, blindfolded her, and

---

[2]At trial the two intruders were referred to as "No. 1" and "No. 2." We will do the same.

interrogated the McCarters for several hours about Wells Fargo Bank's employees, procedures, and safeguards. Casey testified that during this interrogation, the men threatened to cut off his fingers if he did not respond truthfully to the questions. Dawn informed the men that another bank employee was scheduled to open the bank the next morning instead of her. The duo's plan continued to evolve as they learned more information about the bank and its procedures.

The next morning, No. 2 took Casey's vehicle to the other bank employee's house to disable her car, in the hopes that Dawn would then have to open the bank. No. 1 drove Dawn in her car to the bank, leaving Casey tied to a chair in the house. However, while No. 2 was attempting to disable the bank employee's car, he was spotted by that employee's husband, who gave chase and called the police. No. 2 used a cell phone to call No. 1. No. 2 informed No. 1 that he was fleeing from the police and told No. 1 to abort their plan to rob the bank. As a result, No. 1 left Dawn in her own vehicle, and he fled with No. 2.

The police conducted DNA testing on a clear drinking glass, a Styrofoam cup, and a paper napkin that had been used by the kidnappers in the McCarters' home. DNA testing revealed that Huddleston was the major contributor of genetic material to a scientific certainty.[3] In Casey's vehicle, police found a handgun, a pair of sunglasses consistent with those worn by No. 1 and No. 2

---

[3]The probability of selecting an unrelated person at random who could have been the source of the DNA was 1 in 460 quintillion, or expressed another way, 1 in 70 billion times the world's population.

during the kidnapping, and a blood stain on the driver's side window. DNA testing of the blood stain proved, to a scientific certainty, that Huddleston was the single contributor of genetic material and that he had been inside that vehicle.

Cell phone records revealed a number of calls between Huddleston and his codefendant, Cary McGowen, during the alleged offenses. Police learned that Huddleston and McGowen were cellmates during a period of incarceration and that Huddleston had five prior convictions for offenses ranging from armed bank robbery in two different states to involvement in a "chop-shop" operation.[4]

A search of Huddleston's home also revealed a gym bag similar to the one described by the McCarters containing a wig, zip ties, gloves, a police scanner, a screwdriver, a hammer, and a crowbar. Casey identified the hammer, which had been taken from his garage, as his father's.

### III. SUFFICIENCY OF THE EVIDENCE

Huddleston's first three points complain of the sufficiency of the evidence to support his conviction for conspiracy to commit aggravated robbery. Huddleston argues in his first two points that the evidence supporting the conspiracy conviction is factually insufficient because the evidence shows, at best, Huddleston's mere presence at the crime scene at some point in time and because there is a lack of evidence to show an agreement between Huddleston

---

[4]A "chop-shop" is generally a location or business that disassembles stolen vehicles for the purpose of selling them for parts. The State presented evidence of Huddleston's previous conviction for the removal or alteration of vehicle identification numbers during the punishment phase of trial.

and McGowen. Huddleston argues in his third point that the evidence is legally insufficient to support his conspiracy conviction because it fails to show an agreement that a gun would be used to rob the bank. In his fourth point, Huddleston argues that the evidence is factually insufficient to support his aggravated kidnapping convictions because there was no evidence that he was the individual who displayed a deadly weapon or restrained the victims and there was no evidence that he was in agreement with the actions taken by his co-defendant.

Because the Texas Court of Criminal Appeals recently held in *Brooks v. State* that there is no meaningful distinction between the *Clewis v. State*[5] factual sufficiency standard and the *Jackson v. Virginia*[6] legal sufficiency standard, we will analyze Huddleston's arguments under the standard set forth in *Jackson*. *See Brooks*, 2010 WL 3894613, at *8.

## A. Standard of Review

In reviewing the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the prosecution in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

---

[5] 922 S.W.2d 126 (Tex. Crim. App. 1996), *overruled by Brooks v. State*, No. PD-0210-09, 2010 WL 3894613, at *8 (Tex. Crim. App. Oct. 6, 2010).

[6] 443 U.S. 307, 99 S. Ct. 2781 (1979).

5

This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778. The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); *Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 2075 (2009). Thus, when performing a sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1131 (2000). Instead, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). We must presume that the factfinder resolved any conflicting inferences in favor of the prosecution and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton*, 235 S.W.3d at 778.

The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor. *Clayton*, 235 S.W.3d at 778; *Hooper*, 214 S.W.3d at 13.

## B. Aggravated Kidnapping

To prove aggravated kidnapping, the State must prove that the accused intentionally or knowingly abducted another person and used or exhibited a

6

deadly weapon during the commission of the offense. Tex. Penal Code Ann. 20.04(b) (Vernon 2003); *Hines v. State*, 75 S.W.3d 444, 446 (Tex. Crim. App. 2002). "Abduct" means to restrain a person with the intent to prevent his liberation by either secreting or holding him in a place where he is not likely to be found, or using or threatening to use deadly force. Tex. Penal Code Ann. § 20.01(2) (Vernon 2003). "Restrain" means to restrict a person's movements without consent, so as to interfere substantially with the person's liberty, by moving the person from one place to another or by confining the person. *Id.* § 20.01(1). Such restraint is without consent if it is accomplished by force, intimidation, or deception. *Id.* § 20.01(1)(A). Thus, kidnapping is a completed offense when (1) a restraint is accomplished and (2) there is evidence that the actor had the specific intent to prevent liberation by secretion or by the use or threatened use of deadly force. *Santellan v. State*, 939 S.W.2d 155, 163 (Tex. Crim. App. 1997) (holding that the only requirement for restraint is that the interference with liberty be substantial); *Jenkins v. State*, 248 S.W.3d 291, 293 (Tex. App.—Houston [1st Dist.] 2007, pet ref'd).

For certain offenses, such as burglary, fingerprints or DNA evidence constitute direct evidence of the ultimate fact to be proved and therefore are sufficient to sustain a conviction without further identification evidence. *Clayton*, 235 S.W.3d at 779. When DNA does not constitute direct evidence of the ultimate fact to be proved, it merely establishes the defendant's presence at the scene at some time. *Id.* However, this type of evidence constitutes

7

circumstantial evidence to be considered with the remaining direct and circumstantial evidence. *Id.*

Here, Casey's testimony establishes that two men, both brandishing firearms, restrained him by threatening to hurt or kill him and later by tying his arms and legs to a chair with zip ties. *See* Tex. Penal Code Ann. § 20.01(1)(A); *Santellan*, 939 S.W.2d at 163; *see also Hines*, 75 S.W.3d at 448 (holding that brandishing a shotgun and ordering a bank employee to disable the bank's alarm and open the vault constituted restraint); *Jenkins*, 248 S.W.3d at 295 (holding sufficient evidence of restraint existed when defendant forced his way into a home, brandished a gun, and refused to let victims leave). Casey was still bound to his chair with zip ties and had to be freed by police the following morning. The McCarters' testimony further establishes that the two men also restrained Dawn in the couple's living room by threatening her while brandishing firearms and by forcing her to move from her home to the bank in the passenger side of her vehicle. *See Hines*, 75 S.W.3d at 446.

Huddleston argues that because the McCarters never identified him as one of the intruders and because the DNA evidence placing him at the McCarters' house does not establish *when* he was there, the evidence was insufficient to identify him as one of the kidnappers. But evidence at trial, including the testimony of Chief Edward Crowdis and Officer Anne Hollis of the Springtown Police Department, who conducted a crime scene investigation in the McCarters' home, further corroborated the McCarters' testimony and identified Huddleston

8

and McGowen as the two men who kidnapped the McCarters and conspired to rob the bank. *See Clayton*, 235 S.W.3d at 779. Officer Hollis located DNA evidence showing Huddleston's presence inside the McCarters' home and Casey's vehicle. The McCarters testified that they did not know Huddleston or McGowen, that the two men had never been granted access to their house or vehicles, and that the DNA evidence that police found in their house had been left during the intrusion and kidnapping. The same type of zip ties used to tie Casey to the chair, in addition to a hammer and crowbar taken from the McCarters' house, were later found in Huddleston's belongings. Evidence at trial showed that Huddleston repeatedly used his cell phone near the McCarters' home on the morning of the offense to call McGowen, whose DNA was also found at the McCarter's house. The DNA evidence circumstantially established Huddleston's presence at the crime scene, and when combined with the McCarters' testimony and subsequent evidence discovered by police, was sufficient to prove Huddleston's identity as one of the kidnappers. *See Clayton*, 235 S.W.3d at 779 (holding evidence sufficient for murder conviction when defendant's bloody prints were found at the scene and additional circumstantial evidence existed).

Viewing the evidence in the light most favorable to the jury's verdict, we hold that a rational trier of fact could have found beyond a reasonable doubt that Huddleston was one of the kidnappers who restrained the McCarters while exhibiting a firearm and that he acted with the specific intent to prevent their

9

liberation through force and threats of force. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789. Accordingly, we hold that the evidence is sufficient to support Huddleston's convictions for aggravated kidnapping, and we overrule Huddleston's fourth point.

### C. Conspiracy to Commit Aggravated Robbery

A person commits criminal conspiracy if, with intent that a felony be committed, (1) he agrees with one or more persons that they or one or more of them engage in conduct that would constitute the offense and (2) he or one or more of them performs an overt act in pursuance of the agreement. Tex. Penal Code Ann. § 15.02(a) (Vernon 2003); *McCann v. State*, 606 S.W.2d 897, 898 (Tex. Crim. App. [Panel Op.] 1980). An agreement constituting a conspiracy may be inferred from the acts of the parties. Tex. Penal Code Ann. § 15.02(b) (Vernon 2003); *McCann*, 606 S.W.2d at 898.

Huddleston argues that there is insufficient evidence to show an agreement with McGowan to commit aggravated robbery or that a gun would be used during the robbery. But the evidence produced at trial suggests otherwise. We have already detailed the evidence identifying Huddleston as one of the kidnappers. Additionally, the McCarters testified that both men who broke into their house interrogated them and formulated a plan to rob a Wells Fargo Bank the following morning. Phone records admitted at trial show multiple calls between the two of them on the morning of the planned bank robbery. Dawn was compelled to provide both men with maps and diagrams of the bank and to

10

explain the bank's security measures, procedures, and other employees, including their home addresses. The statements made by the kidnappers were indicative of a conspiracy to commit an aggravated robbery: "We're just here for the money," "We'll ask all the questions," "We have another one of the tellers already abducted and we've got a phone connection between us and if you lie to us, we're going to cut your fingers off."

Huddleston performed numerous overt acts, including breaking into the McCarters' home, threatening the McCarters while brandishing a gun, driving Dawn to the bank the following morning, and deliberately planning the robbery with McGowan. The evidence at trial showed both men exhibited a firearm at all times while the McCarters were restrained, kidnapped, and interrogated. The McCarters testified that the men planned to abduct the second bank employee inside the bank the following morning to gain access to the safe. Both men wore gloves to avoid leaving fingerprints and wore masks to conceal their identities. When McGowan was discovered flattening the tires of the bank supervisor's car, he called Huddleston for help while eluding police. Huddleston picked up McGowen, and the two fled together. McGowen left a handgun loaded with fifteen rounds of live ammunition in one vehicle and fled with Huddleston in another.

Viewing the evidence in the light most favorable to the verdict, we hold that a rational trier of fact could have inferred that Huddleston agreed with McGowen to commit aggravated robbery and that Huddleston performed overt acts in

11

pursuance of the agreement. *See* Tex. Penal Code Ann. § 15.02(a); *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *McCann*, 606 S.W.2d at 898; *see also Campbell v. State*, 128 S.W.3d 662, 671–72 (Tex. App.—Waco 2003, no pet.) (noting that it is doubtful one can exhibit a deadly weapon during the commission of a felony without using it to achieve an intended result). Accordingly, we hold that the evidence is sufficient to support Huddleston's conviction for conspiracy to commit aggravated robbery, and we overrule Huddleston's first, second, and third points.

## IV. CONCLUSION

Having overruled Huddleston's four points, we affirm the trial court's judgments.

SUE WALKER
JUSTICE

PANEL: GARDNER, WALKER, and GABRIEL, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: December 2, 2010